# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

ANTHONY JAMES, individually and
on behalf of a class of all persons and
entities similarly situated,

     Plaintiff,

     v.

FIRST FAMILY INSURANCE, LLC,

     Defendant.

_____/

CASE NO.:  2:24-cv-00098-JLB-KCD

## DEFENDANT'S MOTION TO COMPEL ARBITRATION
## AND TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

Defendant, First Family Insurance, LLC ("First Family") moves to compel arbitration and to dismiss this action under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA") and Federal Rule of Civil Procedure 12(b)(1).  Alternatively, First Family moves to compel arbitration and to stay this proceeding under Section 3 of the FAA until the arbitrator enters a final award.

## PRELIMINARY STATEMENT

Plaintiff Anthony James filed his Class Action Complaint on January 30, 2024. *See generally* Compl. (Dkt. No. 1).  James asserts one cause of action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA"), alleging he received telephone calls on April 25, 2023 in violation of the TCPA's national registry "do-not-call" rules.  *See id*. at ¶¶ 45-49.  Plaintiff seeks to represent a nationwide class of persons "whose (1) telephone numbers were on the

National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing calls from or on behalf of the Defendant (3) within a 12-month period, (4) from four years prior the filing of the Complaint." *Id.* at ¶ 34.

First Family obtained Plaintiff's telephone number and information after James submitted his information on the website "Medigap.com," including the submission page at the URL https://www.medigappolicies.org/form (collectively referred to as the "Site"). On the Site, when the Plaintiff made a submission and provided his information, he consented to receive telephone calls from a hyperlinked list of companies and was put on inquiry notice of the Terms of Service. Those Terms of Service required arbitration of the claims asserted in this lawsuit and expressly waived Plaintiff's rights to bring a class action suit or class arbitration.

Under settled principles of law and in furtherance of the strong federal policy in favor of enforcing agreements to arbitrate, the Court should dismiss Plaintiff's Complaint and compel him to proceed to arbitration. James agreed to Terms of Service requiring arbitration of his claim and providing for the arbitrator – not the Court – to decide issues of arbitrability. For the reasons detailed below, the Court should dismiss Plaintiff's Complaint and compel him to proceed to arbitration.

## STATEMENT OF FACTS

On April 25, 2023 at or around 9:58 a.m. Eastern Daylight Time, Plaintiff visited a website bearing the name Medigap.com, and more specifically made a submission at the URL https://www.medigappolicies.org/form. The Site is owned

and operated by Excel Impact, LLC ("Excel Impact"). *See* Declaration of Dan Lilly at ¶¶ 6 & 7. Upon landing on the Site, Plaintiff answered a series of questions such as what type of Medicare "gap" coverage plan he was interested in, if he was currently enrolled in Medicare Parts A & B, and his gender. *Id.* at ¶ 8. After answering the questions, the Plaintiff entered personal information such as date of birth, home address, full name, e-mail address, and telephone number. *Id.* at ¶ 17-18. Tellingly, Plaintiff entered a date of birth of "4/20/1955," but publicly available records show that he was born in November 1985 (which would make him too young to be eligible for Medicare insurance plans). *See* Ex. A at 2.[1] And Plaintiff has resided in Miami, Florida since approximately 2018, although the address of "19825 Winslow Rd" in Ohio that he submitted on the Site is one previously associated with Plaintiff. *See* Ex. A at 2-4.

As reflected in the data provided by Excel Impact from his Site submission, the Jornaya TCPA Guardian Report and "Visual Playback," and the ActiveProspect TrustedForm certificate and "Session Replay," James provided his information and clicked the button shown above on April 25, 2023 (his information would not otherwise have been provided to First Family). *See* Lilly Decl. at ¶¶ 8, 17-20, 26-31 & Exhibits C and D thereto.

More specifically, Plaintiff entered his personal information and clicked on

---

[1] "4/20" appears both in the fake date of birth and the e-mail address he supplied, "STILLCHOKIN420@AOL.COM." Lilly Decl. at ¶ 17. Not coincidentally, Plaintiff is a part owner of a chain of smoke shops in Miami called "Vice City Smoke Shop." *See* Exs. B-F. Numerous on-line reviews refer to "Anthony" or "Ant," with some stating he is the owner. *See* Exs. G-K.

a "Get My Free Quotes" button.   Above that button is text that says "By clicking the 'Get My Free Quotes' Button, I agree to the consents below the button.  No obligation to enroll." *Id.* at ¶ 8.  The consents below the button read, "By clicking the Get My Free Quotes button and submitting this form, I agree that I am 18+ years old and I provide my signature expressly consenting to receive emails, calls postal mail, text messages and other forms of marketing communication regarding Medicare Insurance plans, or other offers from the <u>listed companies</u> and agents to the number(s) I provided, including a mobile phone, even if I am on a state or federal Do Not Call List and/or Do Not Email registry."   *Id.*   A partial screenshot from the Jornaya "Visual Playback" of Plaintiff's visit on the Site, which accurately depicts the layout of the Site on April 25, 2023, (*id.* at ¶ 24), appears below:



Clicking on the hyperlink for the "listed companies" on the website generates a pop-up box titled "List of Insurance Companies & Agencies That May Be Contacting You."  *Id.* at ¶¶ 10-11 & Exhibit A thereto.  First Family Insurance is on

this list and was on April 25, 2023. *Id*. at ¶ 10. Moreover, some of the listed entities have the text "and partners" written alongside their name, followed by a hyperlink in parentheses labeled "view here." Within several of these hyperlinked lists, First Family Insurance is also listed as a partner. *Id*. at ¶ 12.

Each page on the Site, from the initial landing page through the form submission page, states at the bottom, using blue hyperlinks, "By using this site, you acknowledge that you have read and agree to the Terms of Service. and Privacy Policy." *Id*. at ¶ 13.

Clicking on the hyperlink for the "Terms of Service" opens a new browser window contains the Terms of Service being agreed to. *Id*. at ¶¶ 13-16. The arbitration provision appears in the Section under the heading "8. Agreement to Arbitrate" (the "Arbitration Agreement"). *Id*. at ¶ 16.

First Family has no record of receiving James's telephone number other than from Excel Impact and has no record of any telephone calls to James's telephone number prior to April 25, 2023, the date of his submission on the Site. *See* Declaration of John Blanchard ¶¶ 3-5.

**AGRUMENT**

## I.   APPLICABLE LEGAL STANDARDS

Section 4 of the FAA permits a court to compel arbitration when one party, as in this case, has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4. *See also*, *e.g.*, *Witt v. D.R. Horton, Inc.*, No. 808-CV-2414-T-33EAJ, 2009 WL 54902, at *1 (M.D. Fla. Jan. 7, 2009). Arbitration

agreements are governed by and enforceable under the FAA. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23-24 (1991). "Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2009) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)). The FAA and the strong federal policy favoring arbitration that it evidences require courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Consistent with that strong federal policy favoring arbitration, "[f]ederal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Id.* (citing *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). *See also Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (explaining that "it is the role of courts to 'rigorously enforce agreements to arbitrate'" and to construe any doubt in favor of arbitrability). "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25.

A district court must consider three factors on a motion to compel arbitration: "1) whether a valid written agreement to arbitrate exists; 2) whether an arbitrable issue exists; and 3) whether the right to arbitrate has been

waived." *Williams v. Eddie Acardi Motor Co.*, No. 3:07-cv-782-J-32JRK, 2008 WL 686222, at *4 (M.D. Fla. Mar. 10, 2008) (citations omitted). In this district, "[m]otions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)." *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1222 (M.D. Fla. 2013). "Accordingly, in ruling on a motion to compel arbitration, the Court may consider matters outside the four corners of the complaint." *Lowe v. Charter Commc'n Holdings LLC*, No. 619CV1621ORL40EJK, 2019 WL 13248799, at *1 (M.D. Fla. Nov. 5, 2019).

## II.    THE COURT SHOULD COMPEL ARBITRATION

### A.    A Valid Written Arbitration Agreement Exists

Plaintiff entered into a valid agreement requiring him to arbitrate his TCPA claim against First Family when he agreed to the Terms of Service on the Site, including the Arbitration Agreement, when he submitted his personal information to receive a personalized Medicare quote (for a product he was not eligible to use, using a date of birth that is not associated with him for someone else to possibly have submitted).  While the Court should find that this is an issue that has been delegated to the arbitrator, even if the Court takes up this question in deciding whether arbitration can be compelled, it should find in the affirmative.

#### 1.    The Question of the Existence of a Valid Written Arbitration Agreement Has Been Delegated to the Arbitrator

As a threshold issue, the Arbitration Agreement includes a clause giving the

arbitrator "exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of this Agreement including, but not limited to, any claim that all or any part of the Agreement to Arbitrate or this Agreement is void or voidable." Lilly Decl., Ex. B at § 8. The above-quoted delegation provision in the agreement to arbitrate, which Plaintiff agreed to, indisputably sends the question of the formation, validity, and enforceability of the Arbitration Agreement along with any "gateway" issues to the arbitrator as a dispute delegated to him or her to resolve. *See Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. 524, 529 (2019) ("[C]ourts must enforce arbitration contracts according to their terms. Applying the Act, we have held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also "gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'") (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).[2]

In addition to the express delegation provision in the Arbitration Agreement, it provides that "any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered,

---

[2] *See also*, *e.g*., *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 440 (2006) ("a challenge to the validity of a contract as a whole, and not specifically to the arbitration clause within it, must go to the arbitrator, not the court"); *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (upholding "delegation provision" in arbitration agreement in which parties had "agree[d] to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement").

or purchased through our Services shall be resolved exclusively through final and binding arbitration," which "will be conducted by the American Arbitration Association ('AAA') under its rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (as applicable), as modified by this Agreement to Arbitrate." Lilly Decl., Ex. B at § 8. The Arbitration Agreement's incorporation of the "AAA's Supplementary Procedures for Consumer-Related Disputes," (*id.*), "demonstrates a clear and unmistakable intent that the arbitrator should decide all questions of arbitrability" because those rules contain "language providing that 'the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the *existence*, scope or *validity* of the arbitration agreement.'" *In re Checking Acct. Overdraft Litig.*, 856 F. App'x 238, 243 (11th Cir. 2021) (emphases added). *See also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1298 (11th Cir. 2022).[3]

The Court should therefore compel arbitration on this basis alone.

### 2.   In the Alternative, the Court Should Find Plaintiff Entered Into a Valid Arbitration Agreement

Nevertheless, if the Court is of the view that it can and should decide the existence and validity of the Arbitration Agreement, it is plainly evident that both are established here with respect to the Arbitration Agreement Plaintiff entered

---

[3] The "AAA's Supplementary Procedures for Consumer-Related Disputes" have been amended and renamed the AAA's Consumer Arbitration Rules. *See* Ex. L at Rule R-1(a)(2). Rule R-14 of the Consumer Arbitration Rules sets forth that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim," including "the existence or validity of a contract of which an arbitration clause forms a part." *Id.* at Rule R-14(a) & (b).

into on the Site.

Federal law provides that a written provision to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[U]nder the FAA, no party can be compelled to arbitrate unless that party has entered into an agreement to do so."  "[W]hen determining whether an arbitration agreement exists, 'courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'"  *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (citations omitted).  Thus, the "threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Agostino v. Ally Fin. Inc.*, No. 8:18-CV-1202-T-36TGW, 2018 WL 6019197, at *3 (M.D. Fla. Nov. 16, 2018) (internal citation omitted).  A valid agreement to arbitrate is formed where there is mutual assent to certain and definite contractual terms, such as the agreement the Plaintiff entered into on the Site.  *See id.* at *3.

Even in this age of internet commerce, traditional contract-based principles of offer and acceptance still guide the determination of whether a valid arbitration agreement exists.  *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) ("whether an arbitration agreement exists at all is simply a matter of contract") (internal quotations and citations omitted); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) (commerce conducted over the internet "has not fundamentally changed the principles of contract").

Florida courts have recognized that there are two main types of internet

contracts:  (1) clickwrap agreements in which a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions, and (2) browsewrap agreements in which a website provides a link to the terms and conditions and does not require the purchaser to click an acknowledgment during the checkout process such that the purchaser can complete the transaction without visiting the page containing the terms and conditions.  *Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1190 n.3 (S.D. Fla. 2021), *aff'd*, No. 21-11567, 2022 WL 1499693 (11th Cir. May 12, 2022).

Under Florida law, a browsewrap agreement is enforceable when: (1) the purchaser has actual knowledge of the terms and conditions, or (2) when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice.  *Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1190 n.3 (S.D. Fla. 2021), *aff'd*, No. 21-11567, 2022 WL 1499693 (11th Cir. May 12, 2022).  Even if Plaintiff did not have actual notice of the Terms of Service, Plaintiff was conspicuously advised throughout the Site of the Terms of Service so as to put him on reasonable notice.

On every page on the Site, Plaintiff was advised, "By using this site, you acknowledge that you have read and agree to the Terms of Service and Privacy Policy."  Lilly Decl. at ¶ 13.  The words "Terms of Service" were stated in blue text or blue underlined text, as shown in the below partial screenshots:







*Id.* at ¶ 13.[4]

The blue, underlined text "Terms of Service" contrasted with the other text

---

[4] As shown above, Plaintiff expressly agreed to receive the telephone calls at issue in this lawsuit. Thus, regardless of the outcome of this Motion, Plaintiff consented to receive the very telephone calls that form the basis of his lawsuit.

to further make clear that the Terms of Service were hyperlinked (where Plaintiff could read the full Arbitration Agreement), setting it apart.  Courts have found that such a reference to terms or conditions make their existence sufficiently conspicuous as to put the website visitor on inquiry notice of an agreement or contract.  *See, e.g., Kravets v. Anthropologie, Inc.*, No. 22-CV-60443, 2022 WL 1978712, \*13 (S.D. Fla. June 6, 2022) (white text set against blue background was clearly and conspicuously set forth so as to give plaintiff inquiry notice); *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018) (hyperlink located at the end of a short message was sufficiently conspicuous to put a user on notice that conditioned use of the service constituted assent to the terms and conditions).

Here, having been put on inquiry notice of an agreement, once Plaintiff clicked the "Get My Free Quotes" button, he is charged with agreeing to the Terms of Service and the Arbitration Agreement therein.  Even though the full Arbitration Agreement is in Section 8 of the Terms of Service, the page where Plaintiff entered his information – like every other page on the Site – conspicuously displayed the hyperlink to the full Terms of Service, where the first paragraph states, "THIS AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE ALL CLAIMS, A PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF, AND CONTAINS DISCLAIMERS OF WARRANTIES AND LIABILITY (Sections 5 and 8). These provisions form an essential basis of our bargain." Lilly Decl., Ex. B at § 1.  This is one of the legal consequences Plaintiff

was given notice of in advance of clicking "Get My Free Quotes."  By accessing, browsing or using the Site, or using the tools, forms or services offered through the Site, Plaintiff thus agreed to be bound by the Terms of Service.

Moreover, "screen captures" using data tracked by **two** industry leaders in lead validation and verification, Jornaya and ActiveProspect, during Plaintiff's visit to the Site provides visual evidence of his visit.  *Id.* at ¶¶ 20-31.  Plaintiff therefore cannot plausibly dispute that he visited the Site on April 25, 2023, saw the layout and text as described above, and made a submission on the Site in part to receive phone calls, all of which effected his agreement to the Terms of Service and thus there is a valid agreement to arbitrate.  Indeed, it is unclear why anyone other than Plaintiff would have submitted his information on the Site, particularly when Plaintiff is not eligible for the Medicare insurance products mentioned on the Site, and if they had been pretending to be him it is unclear why they would have entered his childhood address and a "4/20" date of birth that is not associated with him.[5]

### B.    James's TCPA Claim Raises Arbitrable Issues

Only if the Court finds the question of arbitrability of James's claims has not

---

[5] Where the issue is before a court, the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."  9 U.S.C. § 4.  The Court applies a "summary judgment-like standard" and consequently "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement."  *Bazemore*, 827 F.3d at 1333 (quoting Fed. R. Civ. P. 56(a)).  "A Plaintiff can raise a genuine issue of fact regarding the validity of an arbitration agreement by (1) making an unequivocal denial that there was an agreement, and (2) producing evidence to substantiate the denial."  *Hilton v. Fluent*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018) (citation and internal quotations omitted).

been delegated, and the court must decide the question, it should answer in the affirmative.

In determining the scope of the arbitration clause, courts look at the parties' intent to submit the dispute to arbitration, starting at the language of the arbitration provision, and construing any doubt in favor of arbitrability in accordance with the strong federal policy favoring arbitration. *See*, *e.g.*, *Mitsubishi*, 473 U.S. at 626 ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). The Arbitration Agreement states, in relevant part:

> You and we each agree that any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered, or purchased through our Services shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify. The Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate section . . . .

Lilly Decl., Ex. B at § 8. The same section also notes that it expressly includes "actions under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq." *Id.*

James's action brought here under the TCPA is one such action, and squarely concerns, at the least, the "Services," if not also "products or services sold, offered, or purchased through [Excel Impact's] Services." *Id.* The Terms of Use make clear, in Section 3, headed "Matching Tools and Services," that "[o]ur Website provides tools and services to help you find insurance coverage or quotes for insurance coverage, all of which are provided by third parties unaffiliated with medigap.com

(collectively, 'Insurers')," "with whom we may share your information . . . for the purpose of enabling you to find affordable insurance coverage," including through telephone calls to the telephone number submitted on the Site. *See id.*, Ex. B at § 3. Plaintiff's claims concern his opt-in and the consent that he submitted on the Site to be called by the listed companies, including First Family, which led to the calls at issue to Plaintiff. *Id.* at ¶¶ 8-12, 17-19; Blanchard Decl. at ¶¶ 3-5.

Moreover, the fact that James's TCPA claim is a statutory claim does not place it outside the scope of a valid arbitration agreement. "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA," "'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Gilmer*, 500 U.S. at 26 (quoting *Mitsubishi*, 473 U.S. at 628). "[T]he party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). Nothing in the text or legislative history of the TCPA evidences any such intention.

### C.    First Family Has Standing to Enforce the Arbitration Agreement

Although First Family is not a signatory to the Terms of Service or the Arbitration Agreement, it is an intended third party beneficiary, and thus can enforce the Arbitration Agreement and compel arbitration of Plaintiff's claims. "[A]rbitration agreements may be enforced by nonsignatories through

assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'"  *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643-44 (U.S. 2020) (internal quotation omitted).

Once again, this is a question that the Arbitration Agreement delegates to the arbitrator expressly and by incorporation of the AAA Consumer Arbitration Rules, including the previously quoted Rule R-14.  *See* Lilly Decl., Ex. B at § 8; Ex. L at 7(a).  *Accord Henry Schein*, 139 S. Ct. at 529-531.  As a court in a frequently cited decision explained,

> Plaintiff's third-party beneficiary argument is for the arbitrator to decide . . . .  Here, the subject agreement provides the arbitrator with "exclusive authority to resolve any dispute," and any dispute encompasses the third-party beneficiary dispute.  Therefore, giving full effect to the terms of the arbitration agreement, the Court must defer to the arbitrator on this dispute if arbitration is otherwise mandated.

*Bell v. Royal Seas Cruises, Inc.*, No. 19-CV-60752, 2020 WL 5742189, *4-5 (S.D. Fla. May 13, 2020), report and recommendation adopted, 2020 WL 5639947 (S.D. Fla. Sept. 21, 2020).  *See also*, *e.g.*, *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) ("[W]hether Rees can enforce the arbitration agreement against Swiger presents a question of arbitrability that Swiger's arbitration agreement delegated to an arbitrator.").

Again, however, if the Court were to decide this question, it should find First Family has the ability to enforce the Arbitration Agreement in this case.  Under Florida law, "a non-party to a contract containing an arbitration clause may compel

parties to the contract to arbitrate if it is determined that the non-party is a third-party beneficiary to the contract." *Capua v. Air Europa Lineas Aereas S.A. Inc.*, No. 20-CV-61438-RAR, 2021 WL 965500, *5 (S.D. Fla. Mar. 15, 2021) (citing *Peters v. The Keyes Co*., 402 F. App'x 448, 451 (11th Cir. 2010)). "A third party may invoke the agreement only if the parties to the contract clearly express an intention to confer a benefit on the third party." *Id.* (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 983 (11th Cir. 2005)).

The Terms of Service establish that "Our Website provides tools and services to help you find insurance coverage or quotes for insurance coverage, all of which are provided by third parties unaffiliated with medigap.com (collectively, 'Insurers')," and the term "Insurers" is further defined to include, among other things, "medigap.com's marketing partners, . . . with whom we may share your information (as described in our Privacy Policy) for the purpose of enabling you to find affordable insurance coverage." Lilly Decl., Ex. B at § 3. The Terms of Use further state, under the heading "8. Agreement to Arbitrate":

> You and we each agree that ***any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered, or purchased through our Services*** shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify.

*Id.* at § 8 (emphasis added).

This showing is more than enough to find Plaintiff's claims raise an arbitrable dispute that he agreed "shall be resolved exclusively through final and binding arbitration," including when asserted against someone other than Excel

Impact, as the TCPA claims in this case "relate to or arise from [Plaintiff's] use of or access to the "Services, or any products or services sold, offered, or purchased through [Excel Impact's] Services," (*id.*), and the calls arose only from the opt-in on the Website. *See* Blanchard Decl. at ¶¶ 3-5.

### D. First Family Has Not Waived the Right to Arbitrate

Finally, First Family has not waived the right to arbitrate Plaintiff's claims. "[W]aiver of the right to arbitration occurs 'when a party . . . *substantially participates* in litigation to a point inconsistent with an intent to arbitrate." *Soriano v. Experian Info. Sols., Inc.*, No. 2:22-CV-197-SPC-KCD, 2022 WL 6734860, *3 (M.D. Fla. Oct. 11, 2022) (quoting *Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1366 (11th Cir. 1995)), objections overruled, 2022 WL 17551786 (M.D. Fla. Dec. 9, 2022).  First Family is moving to compel arbitration a few weeks after filing its response to the Complaint, which included as an affirmative defense that the claims were subject to an arbitration agreement, (Dkt. No. 12 at Aff. Def. No. 27), and before engaging in any discovery.  Nothing like the kind of delay or substantial participation in litigation before invoking the right to arbitration has occurred in the brief history of this case.[6]

---

[6] *See, e.g.*, *Morewitz)* 62 F.3d at 1366 (finding waiver where five years elapsed before arbitration was invoked); *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990) (same after twenty month delay).  *Cf. Vanwechel v. Regions Bank*, No. 8:17-CV-738-T-23AAS, 2017 WL 1683665, *2 (M.D. Fla. May 3, 2017) ("In contrast, the defendants in this action promptly removed the action, moved within a week of removal to compel arbitration, and submitted no other motion. The removal establishes no waiver of the right to compel arbitration.").

## III.    THE CASE SHOULD BE DISMISSED, NOT STAYED

Finally, the proper disposition of this case after compelling the parties to proceed to arbitration should be dismissal.  The FAA provides, in pertinent part, that a court compelling arbitration "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3.   Despite this statutory language, district courts have made clear that "[t]he weight of authority clearly supports *dismissal* of the case when *all* of the issues raised in the district court must be submitted to arbitration." *Cusolito v. Citibank, N.A.*, No. 0:17-CV-60963-WPD, 2017 WL 8890662, *3 (S.D. Fla. Oct. 6, 2017) (internal citations omitted) (emphasis added).  *See also Garcia v. Kendall Lakes Auto., LLC*, No. 18-24397-CIV, 2019 WL 1359475, *7 (S.D. Fla. Mar. 26, 2019) (compelling arbitration and dismissing TCPA complaint).  Ultimately, "district courts are vested with discretion to determine whether stay or dismissal is appropriate." *Swartz v. Westminister Servs., Inc.*, No. 8:10-CV-1722-T-30AEP, 2010 WL 3522141, *2 (M.D. Fla. Sept. 8, 2010).  This Court should exercise its discretion to compel arbitration and dismiss this case.

## CONCLUSION

The Court should enter an order compelling the arbitration of Plaintiff's TCPA cause of action and dismissing this case.  Alternatively, this case must be compelled to arbitration and the proceedings stayed under Section 3 of the FAA until the arbitrator enters a final award.

## LOCAL RULE 3.01(g) CERTIFICATION

On April 26, 2024, undersigned counsel for First Family conferred with Avi Kaufman, counsel for Plaintiff, by telephone regarding the relief requested in this Motion.  Mr. Kaufman advised that Plaintiff opposes the requested relief.


Dated:  April 26, 2024                     GREENSPOON MARDER LLP

                                           */s/ Roy Taub*
                                           Jeffrey A. Backman
                                           Roy Taub
                                           200 E. Broward Blvd., Suite 1800
                                           Ft. Lauderdale, FL  33301
                                           (954) 491-1120
                                           jeffrey.backman@gmlaw.com
                                           mary.torres@gmlaw.com
                                           roy.taub@gmlaw.com
                                           cheryl.cochran@gmlaw.com

                                           *Attorneys for Defendant*
                                           *First Family Insurance, LLC*


## CERTIFICATE OF SERVICE

I hereby certify that, on April 26, 2024, a true and correct copy of the foregoing was served on all counsel of record via ECF.

                                           */s/ Roy Taub*
                                           ROY TAUB